**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| MARIO TOCA,<br>on behalf of himself and all others<br>Similarly situated,<br><br>                               Plaintiff,<br><br>v.<br><br>TUTCO, LLC., RHEEM<br>MANUFACTURING COMPANY and<br>WATSCO, INC.<br><br>                               Defendants. | Case No.:<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

**CLASS ACTION COMPLAINT**

Plaintiff MARIO TOCA ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following facts and claims upon personal knowledge as to matters relating to himself, and as to all other matters upon information and belief, as follows:

**NATURE OF THE CASE**

1.      Plaintiff brings this class action individually and on behalf of the Class defined herein (the "Class") against Defendants TUTCO, LLC. ("TUTCO"), RHEEM MANUFACTURING COMPANY ("RHEEM"), and WATSCO, INC. ("WATSCO"), to obtain, *inter alia*, damages and injunctive relief for the proposed Class, as defined below.

2.      This case involves the failure of Defendants to include a safety backup switch—known as a non-self-resetting thermal cutoff ("NSRT")—on electric heat kits (the "Heaters") manufactured and/or sold individually or as an integrated part of a heating, ventilation, and air condition ("HVAC") system.  The NRST, which costs less than $1.00, had it been included, would

1

have saved untold amounts in property damage, injuries, and even lives, that have resulted from the fires that the absence of a NSRT permits.

3.     As alleged and explained more fully below, this action seeks to remedy violations of applicable law in connection with Defendants' marketing, advertising, manufacture, sale, and servicing of the Heaters, which are component heating devices used to generate heat in HVAC systems.  Defendants have knowingly concealed material facts regarding the Heaters, including the failure to include NSRTs, an inexpensive backup safety device that accounts for foreseeable conditions that often lead to the Heaters overheating and catching fire and/or igniting adjacent material, rendering them unusable in the manner, to the extent, and for the purpose for which the Heaters were advertised, marketed, and sold as a result of the defect.

4.     Upon information and belief, Defendants knew and were aware, prior to marketing and selling the Heaters, that the Heaters were inherently defective in that they did not include NSRTs and hence were a safety hazard.  Defendants were in exclusive possession of this information, which was material to Plaintiff and class members, and Defendants had a duty, under all circumstances, to disclose the defect to Plaintiff and class members.  Nevertheless, Defendants have failed and refused to warn their customers of the serious common defects inherent in the Heaters or to warn their customers of the common problems that customers will likely encounter as a result of the Heaters' defects.

5.     As a result of the design defects that afflict the Heaters, Plaintiff and other class members have overpaid for the Heaters because the value of the Heaters was diminished at the time they were sold to consumers.  In addition, consumers would not have purchased the Heaters had Defendants informed them of the common defects at the time of sale.  Plaintiff and the class members have consequently suffered economic damages.

6.     Defendants have profited, directly or indirectly, by concealing the nature of the defects because, by misrepresenting or concealing its knowledge regarding the defects at issue and the cause of the problems associated with the defects to consumers, Defendants have been able to convince a large number of consumers to purchase the Heaters.

7.     Defendants' actions in selling the Heaters without disclosing common material defects, and in failing to issue a recall or otherwise promptly taking appropriate corrective action to repair and/or replace the Heaters with this known defect were negligent, reckless, violated state laws, and were in breach of its statutory and common law duties, and express and implied warranties to its customers.  Those actions were a proximate cause of injury to the Plaintiff and the class members.

8.     Plaintiff seeks actual and/or compensatory damages, as well as equitable relief, including the replacement and/or recall of the defective Heaters, costs and expenses of litigation, reasonable attorneys' fees, and all other expenses permitted by applicable law, and declaratory relief via a court order that these Heaters are defective and unfit for use.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative class members, and at least some members of the proposed Class have a different citizenship from Defendants.

10.     This Court has jurisdiction over Defendants as they are each engaged in the business of designing, manufacturing, and/or distributing Heaters throughout the United States, including in the state of Florida; they advertise in a variety of media throughout the United States, including Florida and this District; and through their business operations in this District,

Defendants intentionally avail themselves of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District, Defendants operate within this District, and Defendants caused harm to Class members residing in this District.

12.     All conditions precedent were performed by Plaintiff, have occurred, or were waived by Defendants.

## PARTIES

### The Plaintiff

13.     Plaintiff MARIO TOCA is a resident of the state of Florida.  In or about 2015, Plaintiff purchased for installation at his business property a RHEEM-manufactured HVAC system, which incorporated a TUTCO-manufactured Heater.  This unit was installed at Plaintiff's business address located at 5725 S.W. 77th Terrace South Miami, Florida 33143.  In or about 2018, Plaintiff purchased for installation at his home a RHEEM-manufactured HVAC system, which incorporated a TUTCO-manufactured Heater.  This unit was installed at Plaintiff's home address located at 8861 S.W. 76 Street Miami, Florida 33173.  Upon information and belief, both units enumerated above were sold and/or distributed by and/or through Defendant WATSCO.

### The Defendants

14.     Defendant TUTCO is a Pennsylvania corporation with its principal place of business in Cooksville, Tennessee.  Upon information and belief, at all times relevant, Defendant was engaged in the business of designing, manufacturing, and distributing Heaters throughout the United States, including the state of Florida.

15.    Defendant RHEEM is a Delaware corporation with its principal place of business in Atlanta, Georgia.  RHEEM manufactures and/or sells Heaters and HVAC incorporating Heaters under various brand names, including RHEEM and Ruud.  Upon information and belief, at all times relevant, Defendant was engaged in the business of designing, manufacturing, and distributing Heaters throughout the United States, including the state of Florida.

16.    Defendant WATSCO is a Florida corporation with its principal place of business in Coconut Grove, Florida.  WATSCO distributes and/or sells Heaters and HVAC incorporating Heaters through exclusive distribution agreements with manufacturers such as RHEEM and Carrier Corporation.  Upon information and belief, at all times relevant, Defendant was engaged in the business of distributing Heaters throughout the United States, including the state of Florida.

## FACTUAL ALLEGATIONS

17.    An Air Handling Unit or Air Handler ("AHU") is a device used to condition and circulate air as part of a heating, ventilating, and air-conditioning ("HVAC") system. An air handler is usually a large metal box containing a blower, heating and/or cooling elements, and filters.  Air handlers usually connect to a ductwork system that distributes the conditioned air through the building and returns it to the AHU.[1]

---

[1] https://www.standardheating.com/hvac-maintenance/hvac-diagram/



18. The heat kit consists of heating elements (wire coil) that are mounted inside the air handler, within the airflow supply. They are designed to heat free flowing air.



19. The heating elements are positioned in the airflow supply to warm the air as it moves past the heating elements.

20. However, airflow supply can often become restricted by a variety of factors and events, such as dirty air filters, blocked and/or closed registers, malfunctioning fans, ductwork

issues and myriad other causes.  When airflow is restricted, the heating elements can reach temperatures in excess of 2000°F.

21.     Accordingly, heat kits incorporate automatically-resetting temperature limiting controls ("ARTs").  ARTs are designed to act as an internal thermostat, de-energizing the heating elements when they reach abnormally high temperatures.

22.     Specifically, ARTs seek to maintain safe temperatures through a temperature sensing switch that cycles to open and close contacts in the electric circuit thereby activating and deactivating the heating elements.  When the circuit is closed, the power leading to the heating elements is enabled and the Heater is activated permitting the heating elements to generate heat. When the ART switch is in the open position the power leading to the heating elements is disabled, the heating element is de-energized, and no heat is produced.  This process is known as "cycling." When the temperature returns to a safe level, the ART closes the contacts, reactivating the Heater. As its name belies, the ART is intended to cycle on and off within a preset temperature range automatically and is not opened or shut manually by a human and no warning or indication is given to the structure's occupants.

23.     Unfortunately, this process of cycling on and off—and doing so unbeknownst to building occupants—can create significant safety concerns.  The physical mechanism used by the ART is a contactor to which bi-metallic strips are connected. It is well-known that during an opening or closing action, when the contactors are in close proximity the electric potential can create an arc. The high temperature of the arc can melt small portions of the contractor surface, causing carbon buildup and roughening the surface, exacerbating the arc action. The temporarily melted metal of the surface also can weld the contactors together in a closed position resulting in the ART becoming stuck in a closed position.   Once the ART is compromised in this manner, it

will fail to de-energize the heating elements allowing the Heaters to reach dangerously high temperatures. Overheated heating element(s) can and do cause adjacent surfaces within the HVAC system and the surrounding surfaces to ignite.

24.     To guard against this known, dangerous, and life-threatening issue, many heat kit designs also incorporate a Non-Self-Resetting Thermal Cutoff ("NSRT").  In the event of a failure of the ART and subsequent overheating, the NSRT will open, de-energizing the heating element(s) to prevent fires.

25.     NSRTs are simple, inexpensive devices, costing approximately $1.00.  NSRTs are widely available in the marketplace as melt-able alloy links, known as fuses, or Bi-metal thermal (non-self-resetting) controls with manual pushbutton reset switches. A typical temperature set point for the NSRT is approximately 250 degrees Fahrenheit.

26.     As the name implies, NSRTs do not automatically or self-reset, and, once tripped, must be manually reset by an HVAC technician.  Because the ART must also have failed prior to the NSRT engaging, the technician may replace it as well.  Further, the technician will be on notice that a restricted air-flow condition likely exists and can address that issue as well.

27.     NSRTs are not the only safety device that can prevent hazardous temperatures from building up when airflow is restricted.  Low airflow shutoff switches ("LASS") are also available in the marketplace. These switches are designed to shut down the heater when operating in restricted airflow conditions.

28.     Heaters failing to incorporate a safety device such as an NSRT or LASS, which account for a foreseeable fault in the ART, are defective and dangerous products and a safety hazard.

29.     Indeed, one of the leading manufacturers of ARTs—Emerson Electric with its Therm-O-Disc—warns:

> A control may remain permanently closed or open as a result of exposure to excessive mechanical, electrical, thermal or environmental conditions or at normal end-of-life. **If failure of the control to operate could result in personal injury or property damage, the user should incorporate supplemental system control features to achieve the desired level of reliability and safety**. For example, backup controls have been incorporated in a number of applications for this reason.[2]

30.     There are millions of these defective and dangerous central electric heaters currently installed in homes, apartments, hotels, hospitals and schools, and defective and dangerous heaters continue to be sold and installed every day – Heaters manufactured and/or sold and/or distributed by Defendants.

31.     Upon information and belief, many Heaters manufactured by TUTCO do not include NSRTs.

32.     Upon information and belief, Heaters sold under the RHEEM Manufacturing ("RHEEM") brands, including those Heaters sold individually and those included as components of HVAC systems are manufactured by TUTCO and do not include NSRTs.

33.     According to its 2018 Form 10-K filed with the United States Securities and Exchange Commission, WATSCO "maintain[s] trade name and distribution agreements with Carrier and Rheem that provide[s] [WATSCO] distribution rights on an exclusive basis in specified territories and are not subject to a stated term or expiration date."[3]

34.     Upon information and belief, WATSCO is the exclusive distributor for RHEEM in Florida and Texas.

---

[2] https://www.emerson.com/documents/commercial-residential/60t-product-bulletin-en-us-152042.pdf (emphasis added)
[3] Watsco, Inc., *2018 Annual Report 10-K* (2019) https://investors.watsco.com/node/15181/html

35.     The National Fire Protection Association ("NFPA") 2012 report indicates 540 residential structure fires were caused by automatic control failures. However, this number is likely greatly understated as homeowners are unfamiliar with the defect, fire department investigators are also unfamiliar with the defect and are rightfully focused on ruling out arson—and it is unlikely that typical, general arson-focused investigations will identify the defect alleged herein.

### Violation of the National Electric Code

36.     The National Electric Code ("NEC"), also known as NFPA 70, is an adoptable standard for the safe installation of electrical wiring and systems, and has been adopted in all fifty states in the U.S.  The NFPA states that "the NEC is the benchmark for safe electrical design, installation, and inspection to protect people and property from electrical hazards."[4]  National Electric Installation Standards states that "[k]nowledge of the NEC is an inherent part of doing business in the electrical industry."[5]

37.     The NEC (2017) Section 424, Part VI, dealing with Duct Heaters provides the following:

> 424.64 **Limit Controls**. Each duct heater shall be provided with an approved, integral, automatic-reset temperature limiting control or controllers to de-energize the circuit or circuits.
>
> In addition, an integral independent supplementary control or controllers shall be provided in each duct heater that disconnects a sufficient number of conductors to interrupt current flow. This device shall be manually resettable or replaceable.

38.     The NEC (2014) and (2011) versions contain identical language for Section 424.64.

39.     The common thread among each provision, one of which is adopted in all fifty states, is that two sets of limit controls are required by code: one that automatically resets (ART),

---

[4] https://www.nfpa.org/codes-and-standards/all-codes-and-standards/list-of-codes-and-standards/detail?code=70
[5] http://www.neca-neis.org/safety-and-the-nec/the-national-electric-code-neca

and one that is manually reset or replaced (NSRT).  The Defendants' heaters that do not have an NSRT are in violation of NFPA 70.

40.     While states do have the ability to modify the NEC when adopting it, upon information and belief, Section 424.64 has not been modified by upon adoption by any state.

41.     Not only did Defendants fail to incorporate an NSRT into the subject Heaters, they failed to incorporate any type of additional heater safety measure that would serve a purpose similar or parallel to an NSRT.

42.     As a result of this failure by Defendant TUTCO to meet NEC and local code requirements, when an ART in of their Heaters fails in the closed position, an extreme fire hazard is created.

## Defendants Were on Notice of the Defect and Code Violation

43.     Defendants were well aware of the defects and code violations alleged here.

44.     In 2011, WATSCO's ACDoctor website noted:

**Fail-Safe Over-Heating Protection: A Necessity for Electric Heaters in HVAC Systems**

*Potential Melt-Downs of Electric Heaters Not Having Fail-Safe Thermal Fuse Links Can Cause Fires*

"Without overheating protection, a contractor is literally playing a life and death game. The fire danger and potential life loss is never worth the risk. Having a system in place to prevent the risk seems like a no-brainer." Those are the experienced words of Fred Kobie, president of Kobie Kooling, Fort Meyers, Fla. Automatic reset temperature limit controls are commonly used to cycle the heaters on-and-off. However, it is not widely known that they do not provide fail-safe over-heating protection. In fact, a major automatic reset temperature limit control manufacturer actually disclaims liability with the following notice: "If failure of the control to operate could result in personal injury or property damage, the user should incorporate supplemental system control features to achieve the desired level of reliability and safety."

Heaters having automatic reset temperature limits and no supplemental system control features, such as thermal fuse links, can short-cycle (cycle off and on excessively). This occurs from over-heating due to overvoltage, low airflow, or fan failure. In time, after operating in this abnormal condition, the limit's contacts can fail in the closed position with the contacts welded together (commonly referred to as "sticking"), thus preventing the heater from shutting off safely. Out-of-control overheating and potential melt-down can result. During the equipment's service life, this condition can go unnoticed by the end-user for extended periods of time until fire or other catastrophic damage occurs without any warning.

**Only electric heaters with fuse links that provide fail-safe over-heating protection (or other fail-safe system control features that provide equivalent protection) should be used in homes and buildings to ensure safe operation throughout the life of the equipment.**

The solution is to use thermal fuse links that inherently provide fail-safe overheating protection and do not require "supplemental system control features".[6]

45.     Moreover, in 2017, Defendants RHEEM and TUTCO were sued over including a UL certification although it failed to include NSRTs. *See Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185 (S.D. Fla. 2017).

46.     Defendants were also separately put on notice by manufacturer(s) within the industry that Heaters that did not include a secondary safety mechanism (i.e., an NSRT) over and above the ART, were a safety hazard and that any heater that did not include an NSRT was deficient.

47.     Despite this notice, Defendants continued to distribute, manufacture and/or sell Heaters which did not include the NSRT.

---

[6] https://web.archive.org/web/20120526123735/acdoctor.com/fail-safe-over-heating-protection-sp-1800.html (emphasis added)

48.     Despite this notice Defendant WATSCO continued to sell and distributed heaters manufactured by TUTCO and sold under the RHEEM brand.  These Heaters were sold both individually and as a component of HVAC systems.

### Warranty

49.     Depending on the Heater Model, Defendant TUTCO provides either a one (1) or ten (10) year warranty.  Outside of the length, these warranties contain the same language. Defendant TUTCO's warranty language, taken from the 10-year warranty, states:

> Seller warrants to Buyer that the Heat Kit Products, consisting of the resistance coils, supporting racks, and included controls (other than fusible links and over-current fuses), when installed correctly according to instructions provided by Seller, and when properly maintained, will be free from defects in workmanship and material for ten (10) years after installation, but not to exceed ten (10) years and six (6) months after manufacture. This warranty does not apply to defects caused by faulty installation, misuse, accident, alteration, improper care or use after installation, decreased airflow, dirty filters, unrated voltage or chemical, electrical or physical abuse. If the product or a component is found not to comply with the above warranty, the defective product or component shall be promptly returned, freight prepaid, to Seller's factory for examination. If the failure is due to causes other than faulty installation, Buyer abuse, misuse, accident, alteration, improper care or use after installation, decreased airflow, dirty filters, unrated voltage or chemical, electrical or physical abuse, Seller will repair, or at its option, replace the product, component or parts found to be defective at no charge and return to Buyer with shipping charges prepaid, and issue credit for the incoming shipping charge.[7]

50.     Upon information and belief, the same or similar warranty is included with RHEEM HVAC units which include TUTCO heaters.

---

[7] TUTCP 10-year Warranty

**Representations and Omissions**

51.     Defendants represented that the Heaters they manufactured and/or sold and distributed were safe.

52.     Defendants represented that the Heaters they manufactured and/or sold and distributed met industry standards, including generally accepted safety standards.

53.     Defendants represented that the Heaters they manufactured and/or sold and distributed complied with NEC and local code requirements.

54.     Defendants failed to inform purchasers and/or end users the Heaters did not include an NSRT.

55.     Defendants failed to inform purchasers and/or end users aware that other Heaters with NSRTs were available in the alternative to those that did not include NSRTs.

56.     Defendants failed to make purchasers and/or end users aware of the differences in safety between Heaters with NSRTs and those without.

57.     Defendants failed to inform purchasers and/or end users of the risks associated with Heaters that did not incorporated NSRTs.

**Defendants Continue to Push Unsafe Heaters Into Marketplace**

58.     Ruud, which is owned by RHEEM, issued a "Product Line Updates" announcement, which states that "the new safety standard (UL 1995 Rev 5) requires backup protection on all electric heater kits and factory installed electric heat air handlers by July 31, 2019."  The announcement further states that "heater kits manufactured prior to July 31, 2019 are not required to comply with UL 1995 Rev 5" and that "[a]ny inventory pre-July 31, 2019 production will still be salable."[8]

---

[8] Ruud "Product Line Update"

59.     Ruud did not use their bulletin or update, respectively, to inform the public or its customers of the hazards posed by heaters that do not incorporate NSRTs and that do not comply with UL 1995 Revision 5. Ruud showed a callous disregard for public safety by continuing to attempt to push unsafe heaters into the market despite the fact it, along with TUTCO and Watsco, knew the heaters to be extremely unsafe and life safety hazards.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff brings this suit as a class action on behalf of himself and on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).  The Nationwide Class (the "Class") that Plaintiff seeks to represent is defined as follows:

> All individual consumers in the United States who since January 1, 2011, purchased[9] a Heater or a HVAC system incorporating a Heater, not for resale, that was manufactured or sold by TUTCO, RHEEM, or WATSCO and that does not include an NSRT.

61.     Plaintiff also brings this action on behalf of Sub-Classes, one for each State of the United States and one for the territories of the United States, to the extent appropriate, in the alternative to the claims asserted on behalf of the Class:

> All Class members who since January 1, 2011, purchased a Heater or an HVAC system incorporating a Heater, which did not include a NSRT, that was manufactured or sold by TUTCO, RHEEM, or WATSCO, not for resale, in the State of [State Name]/Territories of the United States ("[State Name]/Territories Class").

62.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.

---

[9] "Purchased" shall include the acquisition of a Heater (i) by payment of consideration for said Heater, or (ii) as part of the purchase or remodeling of a home.

63.     Specifically excluded from the Class are the Defendants, their officers, directors, agents, their corporate parent(s), or entities controlled by Defendants, and their successors or assigns, the Judge assigned to this action, and any member of the Judge's immediate family.

64.     Numerosity.  The members of the Class are so numerous that joinder of all members would be impracticable.  The proposed Class includes thousands of members.  Although the exact number and identity of class members is not presently known, they can be identified through the review of records in Defendants' possession, custody, or control.

65.     Commonality and Predominance.  There are numerous questions of fact and law common to the members of the Class that predominate over individual questions affecting any individual members, including but not limited to:

a.     whether the Heaters possess common defects;

b.     whether Defendants were aware that the Heaters were and are defective;

c.     whether Defendants omitted and concealed material facts from their communications and disclosures to Plaintiff and class members regarding the defects inherent in the Heaters;

d.     whether Defendants were obligated to disclose that the Heaters suffer common defects;

e.     whether Defendants breached their express warranties, and whether the limitations on those express warranties are unconscionable and unenforceable;

f.     whether Defendants breached their implied warranties;

g.     whether Defendants engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices in connection with the sale of the Heaters;

16

h.      whether Defendants have been unjustly enriched from the sale of the

Heaters; and

i.      whether Plaintiff and members of the Class are entitled to recover damages

and, if so, the appropriate amount of those damages.

66.     Defendants' defenses, to the extent that any such defenses apply, are applicable

generally to Plaintiff and the entire Class and are not distinguishable as to proposed class members.

67.     Typicality.  The claims of the Plaintiff herein are typical of the claims of the class

members as a whole, all of whom have sustained and/or will sustain damages, including irreparable

harm, as a proximate or legal result of the common course of conduct of Defendants as complained

of in this class action complaint.  The claims of the Plaintiff are typical of the Class because

Defendants subjected all class members to the same course of conduct.

68.     Adequacy.  Plaintiff, on behalf of himself, and all others similarly situated, will

fairly and adequately protect the interests of all members of the Class, and has retained attorneys

highly experienced in the prosecution of complex consumer class action litigation.  Neither

Plaintiff nor their attorneys have any interests antagonistic to the Class.

69.     Superiority.  A class action is superior to all other available methods for the fair

and efficient adjudication of this lawsuit, because individual litigation of the claims of all class

members is economically unfeasible and procedurally impracticable.  While the aggregate

damages sustained by the Class are likely in the millions of dollars, the individual damages

incurred by each class member resulting from Defendants' wrongful conduct are too small to

warrant the expense of individual suits.  The likelihood of individual class members prosecuting

separate claims is remote, and even if every class member could afford individual litigation, the

court system would be unduly burdened by individual litigation of such cases.  Individual class

members do not have a significant interest in individually controlling the prosecution of separate actions, and the individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  A class action in this matter will avoid case management difficulties and provide multiple benefits, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

70.     Further, without class certification, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that could establish incompatible standards of conduct for Defendants.  Defendants have acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

71.     Notice of a certified class action and of any result or resolution of the litigation can be provided to class members by first-class mail, email, or publication, or such other methods of notice as deemed appropriate by the Court.

72.     Plaintiff does not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Breach of Express Warranty – Defendants RHEEM, and TUTCO
(Asserted by Plaintiff, Individually, and on Behalf of the Class and/or the State Classes)

73.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 above as if fully set forth herein.

74.     Defendants RHEEM and TUTCO made affirmations of fact, promises, and descriptions to Plaintiff and members of the Class which related to Heaters as more fully described herein.

75.     Defendants RHEEM and TUTCO's affirmations of fact, promises, and descriptions became part of the basis of the bargain between the parties.

76.     Pursuant to Fla. Stat. §672.313, these affirmations of fact, promises, and descriptions of the goods are express warranties that the goods shall conform to the affirmation, promise and descriptions.

77.     Defendants RHEEM and TUTCO uniformly warranted all of the Heaters against defects in material or workmanship at a time when they knew that they suffered from serious defects and, nevertheless, continued to market, sell, and distribute the Heaters with this express warranty.

78.     The misrepresentations were made by Defendants RHEEM and TUTCO to induce Plaintiff and the Class members to purchase and were material factors in their decisions to purchase the Heaters.

79.     Defects in the design and defects in the material and/or workmanship of the Heaters have led to or are substantially likely to lead to damage both to Heaters owned by Plaintiff and Class members, as well as damage to other property, including but not limited to, surrounding structures and personal property.

80.     As a direct and proximate result of the breach of said warranties, Plaintiff and Class members have been injured and are therefore entitled to damages.  Defendants RHEEM and TUTCO's failure to repair or replace Plaintiff's Heaters has caused the warranty to fail of its

essential purpose, as a result of which Plaintiff and the class members are entitled to damages flowing from the breach of express warranty.

81.     Alternatively, Plaintiff seeks to recover for Defendants RHEEM and TUTCO's breaches of express warranty under the substantially similar laws of the states of purchase.

**SECOND CAUSE OF ACTION**
Breach of Implied Warranty of Merchantability – All Defendants
(Asserted by Plaintiff, Individually, and on Behalf of the Class and/or the State Classes)

82.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 above as if fully set forth herein.

83.     As a manufacturer, distributor, and/or seller of Heaters, Defendants are "merchants."

84.     The Heaters are "goods."

85.     Implied in every sale of the Heaters is a warranty of merchantability that requires, *inter alia*, that the Heaters pass without objection in the trade and are fit for the ordinary purposes for which the Heaters are used.

86.     Defendants impliedly represented and warranted that the Heaters were fit for the ordinary purposes for which such goods are used, *i.e.*, heating homes safely.

87.     Defendants breached this implied warranty because the Heaters possess design defects that lead to fires, which substantially reduced and/or prevented the Heaters from safely heating homes.

88.     All of the Heaters were manufactured and distributed with the design defects and code violations of failing to include NSRTs and were, therefore, not of merchantable quality at the time that they were distributed into the stream of commerce by Defendant.

89.     Consumers were not in a position to negotiate the terms limiting any implied warranties offered at the point of sale; they were provided with written warranties on a take-it-or-leave-it basis.

90.     Defects in the design and defects in the material and/or workmanship of the Heaters have led to or are substantially likely to lead to damage both to Heaters owned by Plaintiff and Class members, as well as damage to other property, including but not limited to, surrounding structures and personal property.

91.     As a direct and proximate result of the breaches of said warranties, Plaintiff and the class members were injured and are therefore entitled to damages.

92.     Alternatively, Plaintiff seeks to recover for Defendants' breach of implied warranty, under the substantially similar laws of the states of purchase, including Florida (Fla. Stat. § 672.314).

**<u>THIRD CAUSE OF ACTION</u>**
Violations of Magnuson-Moss Act (15 U.S.C. §§ 2301-2312)—Written Warranty - Defendants
RHEEM, and TUTCO
(Asserted by Plaintiff, Individually, and on Behalf of the Class)

93.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 above as if fully set forth herein.

94.      The Heaters are "consumer products," as that term is defined by 15 U.S.C. § 2301(1).

95.     Plaintiff and class members are "consumers," as that term is defined by 15 U.S.C. § 2301(3).

96.     Defendants RHEEM and TUTCO are "suppliers" and "warrantors," as those terms are defined by 15 U.S.C. § 2301(4) and (5).

97.     Defendants RHEEM and TUTCO provided Plaintiff and class members with "written warranties," as that term is defined by 15 U.S.C. § 2301(6).

98.     In their capacities as warrantors, and by the conduct described herein, any attempts by Defendants RHEEM and TUTCO to limit the express warranties in a manner that would exclude coverage of the defective Heaters is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective Heaters is null and void.

99.     All jurisdictional prerequisites have been satisfied.

100.    By Defendants RHEEM and TUTCO's conduct as described herein, including Defendants RHEEM and TUTCO's knowledge of the defective Heaters and their action, and inaction, in the face of that knowledge, Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations.

101.    As a result of Defendants' breaches of express warranties, Plaintiff and the Class members are entitled to revoke their acceptance of the Heaters, obtain damages and equitable relief, and obtain attorneys' fees and costs pursuant to 15 U.S.C. § 2310.

**FOURTH CAUSE OF ACTION**
Violations of Magnuson-Moss Act (15 U.S.C. §§ 2301-2312)—Implied Warranty – All Defendants
(Asserted by Plaintiff, Individually, and on Behalf of the Class and/or the State Classes)

102.    Plaintiff incorporate and re-allege paragraphs 1 through 72 above as if fully set forth herein.

103.    The Heaters are "consumer products," as that term is defined by 15 U.S.C. § 2301(1).

104.    Plaintiff and class members are "consumers," as that term is defined by 15 U.S.C. § 2301(3).

22

105.    Defendants are "suppliers" and "warrantors," as those terms are defined by 15 U.S.C. § 2301(4) and (5).

106.    Defendants provided Plaintiff and class members with "implied warranties," as that term is defined by 15 U.S.C. § 2301(7).

107.    In their capacity as warrantors, and by the conduct described herein, any attempts by Defendants to limit the express warranties in a manner that would exclude coverage of the defective Heaters is unconscionable and any such effort to disclaim, other otherwise limit, liability for the defective Heaters is null and void.

108.    All jurisdictional prerequisites have been satisfied.

109.    By Defendants' conduct as described herein, including Defendants' knowledge of the defective Heaters and their action, and inaction, in the face of that knowledge, Defendants have failed to comply with their obligations under their written and implied promises, warranties, and representations.

110.    As a result of Defendants' breach of express warranties, Plaintiff and the Class members are entitled to revoke their acceptance of the Heaters, obtain damages and equitable relief, and obtain attorneys' fees and costs pursuant to 15 U.S.C. § 2310.

**FIFTH CAUSE OF ACTION**
Injunctive and Declaratory Relief – All Defendants
(Asserted by Plaintiff, Individually, and on Behalf of the Class)

111.    Plaintiff incorporates and re-alleges paragraphs 1 through 72 above as if fully set forth herein.

112.    There is an actual controversy between Defendants and Plaintiff concerning the existence of material defects in the Heaters.

113.    Accordingly, Plaintiff and the Class seek a declaration that the Heaters contain common defects in their design and manufacture.

23

114.     Defendants designed, manufactured, produced, tested, inspected, marketed, distributed, and/or sold Heaters which contain material defects as described herein.  Based upon information and belief, Defendants continues to design, manufacture, produce, test, inspect, market, distribute, and sell Heaters which contain material defects as described herein.

115.     Based upon information and belief, Defendants have taken no corrective action concerning the defects described herein, and have not issued any warnings or notices concerning the defects, nor implemented a recall.

116.     Plaintiff and class members have suffered actual damage or injury or are at risk of suffering actual damage or injury due to the Defendants' Heaters' defects.  Defendants should be required to take corrective action to prevent further injuries, including:

     a.     issuing a nationwide recall of the defective Heaters;

     b.     issuing warnings and/or notices to consumers and the classes concerning the defects; and,

     c.     immediately discontinuing the manufacture, production, marketing, distribution, and sale of the defective Heaters described herein.

### SIXTH CAUSE OF ACTION
Unjust Enrichment – All Defendants
(Asserted by Plaintiff, Individually, and on Behalf of the Class and/or the State Classes)

117.     Plaintiff incorporates and re-allege paragraphs 1 through 72 above as if fully set forth herein, and raise this cause of action in the alternative to Plaintiff's warranty causes of action.

118.     Defendants caused their defective Heaters to be distributed in the stream of commerce with knowledge that the Heaters would be purchased by consumers who possessed a reasonable expectation that the Heaters would be free from material defects.

24

119.     Plaintiff and Class members paid a premium price for the Heaters that Defendants represented as being suitable for ordinary use, and merchantable, thereby conferring a tangible economic benefit upon Defendants.

120.     Defendants have further benefited, directly or indirectly, by avoiding the costs associated with correcting the defect, making repairs, and recalling the defective Heaters.

121.     Defendants have and continue to retain that economic benefit at the expense of Plaintiff and Class members.   Principles of equity and good conscience make it unjust for Defendants to retain the benefit conferred on them by consumers for the Heaters, and Defendants should be required to pay Plaintiff and the class members for this benefit.

### SEVENTH CAUSE OF ACTION
Violation of FDUTPA– All Defendants
(Asserted by Plaintiff, Individually, and on Behalf of the Class and/or the State Classes)

122.     Plaintiff incorporates and re-alleges paragraphs 1 through 72 above as if fully set forth herein.

123.     Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Sta. §501.201 *et seq.,* declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." §501.201

124.     Plaintiff and Class Members are "consumers" as defined by Florida Statue §501.203(7), and the subject transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

125.     Defendants have engaged in unfair, unlawful, and fraudulent business practices by: (1) marketing and selling the Heaters with design defects that cause fires and/or create a substantial risk that such problems would occur with normal use; and (2) intentionally failing to disclose and/or conceal these known defects and risks.

126.    Defendants intentionally concealed and/or failed to disclose that the Heaters have design defects, and that the design defects cause fires, for the purpose of inducing Plaintiff and other class members to purchase the Heaters.

127.    The facts concealed and/or not disclosed by Defendants to Plaintiff and other Class members are material facts in that a reasonable person would have considered them important in deciding whether or not to purchase (or to pay the same price for) the Heaters.

128.    Plaintiff and Class members justifiably acted or relied to their detriment upon the concealment and/or non-disclosed facts as evidenced by their purchase of the defective Heaters.

129.    Had Plaintiff and other class members known of the design defects, they would not have purchased the Heaters, or would have paid less for them.

130.    By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition.

131.    Defendants' acts and practices have deceived and/or are likely to deceive members of the consuming public and the members of the Class.

132.    Defendants knowingly sold Plaintiff and other Class members Heaters with defects that have rendered the Heaters essentially unusable for the purposes for which they were sold.

133.    The injury to consumers by this conduct is greatly outweighed by any alleged countervailing benefit to consumers or competition under all of the circumstances.  Moreover, in light of Defendants' exclusive knowledge of the defects, the injury is not one that Plaintiff and other class members could have reasonably avoided.

134.    Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of its trade and commerce by, inter alia, their (1) marketing and selling Heaters with design defects that cause fires and/or create

a substantial risk that such problems would occur with normal use; and (2) intentionally failing to disclose and/or conceal these known defects and risks

135.    By this cause of action, Plaintiff pleads violations of FDUTPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, on behalf of themselves and the Class, that this Court:

1.    Determine that the claims alleged herein may be maintained as a class action under Federal Rule of Civil Procedure 23, and issue an order certifying the Class as defined above, appointing Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

2.    Award all damages to which Plaintiff and Class members are entitled;

3.    Enter an Order awarding injunctive relief by requiring Defendants to issue corrective actions as described herein;

4.    Grant Declaratory Relief that the Heaters described herein contain a defect, which causes fires;

5.    Award reasonable attorneys' fees, costs and expenses; and

6.    Grant such further and other relief that this Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES TRIABLE**

Dated: September 23, 2019

Respectfully submitted,

/s/John A. Yanchunis

John A. Yanchunis

27

Florida Bar No. 324681
Patrick A. Barthle
Florida Bar No. 99286
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida  33602
Telephone:  (813) 223-5505
Facsimile:  (813) 233-5402
jyanchunis@forthepeople.com
pbarthle@forthepeople.com


Joel R. Rhine
North Carolina Bar No. 16028
Christopher B. Barbour
North Carolina Bar No. 41085
RHINE LAW FIRM, PC
1612 Military Cutoff Road, Suite 300
Wilmington, NC 28403
Telephone: (910) 772-9960
Facsimile:  (910) 772-9062
jrr@rhinelawfirm.com
cbb@rhinelawfirm.com

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 23, 2019 a true and correct copy of the foregoing

was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send

a notice of electronic filing to counsel of record for parties in the case.

/s/John A. Yanchunis